UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
PATRICIA DAMIANO,

                    Plaintiff,

                    v.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
----------------------------------------------------------------X

**MEMORANDUM & ORDER**
15-CV-1074 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

Plaintiff Patricia Damiano ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) alleging the Acting Commissioner of the Social Security Administration (the "Commissioner" or "Defendant") improperly denied Plaintiff's applications for Social Security Disability Insurance ("SSDI") benefits. Plaintiff moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Defendant also moves for judgment on the pleadings. For the reasons set forth below, Defendant's motion is **DENIED**. The Court hereby **REMANDS** this action to the Social Security Administration for further proceedings, including a new hearing and a new decision, consistent with this opinion.

## BACKGROUND AND PROCEDURAL HISTORY

### I. Procedural History

On February 14, 2011, Plaintiff filed an application for disability benefits under the Social Security Act ("the Act") alleging disability commencing on June 2, 2004 due to anxiety and rheumatoid arthritis with pain in her neck, shoulder, arm, hand, knee, and feet, which arose after she gave birth to her first child in 1999. Administrative Record ("Tr.") at 20A, 21, 97, 105-15, 503, 514, 541, ECF No. 15.[1] Plaintiff's application was denied initially on June 30, 2011. *Id.* at 21, 24-27. Plaintiff then timely requested a hearing and appeared before Administrative Law Judge ("ALJ") Michael J. Stacchini on June 27, 2012. *Id.* at 13-29, 499-555. Represented

---

[1] The ALJ noted Plaintiff initially alleged disability from June 2, 2004 but amended the alleged onset date to February 1, 1999 at the hearing. Tr. at 16, 97, 354-56, 503, 541.

by counsel, Plaintiff testified on her own behalf. *Id.* at 499-555. No medical experts testified at the hearing, but vocational expert Yaakov Taitz, Ph.D provided testimony. *Id.* at 542-55. In a decision issued on June 14, 2014, the ALJ found Plaintiff was "not disabled" on or before September 30, 2002, the date Plaintiff was last insured for disability insurance benefits. *Id.* at 13-20, 80. The decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on January 15, 2015. *Id.* at 6-9.

Plaintiff then filed a complaint with the United States District Court for the Eastern District of New York on March 3, 2015. Compl., ECF No. 1. Plaintiff and Defendant both move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *See* Notice of Mot. for J. on the Pleadings, ECF No. 13; Def.'s Mem. of Law in Support of Mot. for Judgment on the Pleadings ("Def. Mem."), ECF No. 14; Notice of Cross Mot. for J. on the Pleadings, ECF No. 15; Pl.'s Mem. of Law in Support of Cross Mot. for J. on the Pleadings ("Pl. Mem."), ECF No. 16.

## II. Relevant Non-Medical Evidence

Plaintiff was born on September 28, 1969. *See* Tr. at 20A. She obtained a GED in June 1987 and worked for an automobile dealership as a warranty specialist during the period from June 1997 to June 1998. *Id.* at 98. Plaintiff testified she worked at that dealership until 1999, when she gave birth to her first son. *Id.* at 530-32. She further testified that prior to then, she worked at a children's apparel shop, in shipping clothing overseas, and for a custom interior company that designed interiors for retail stores. *Id.* at 533-35.

Plaintiff prepared a function report on June 3, 2011. In the report, Plaintiff stated her daily activities consist of taking a hot shower to get herself motivated, having her friends drive her children to school, reading and watching television until her children come home, and

helping her children with their homework until her husband comes home. *Id.* at 105. She reported she is "[i]n pain all the time," experiences "pain all over [her] body," and has both depression and anxiety. *Id.* at 105, 109. According to Plaintiff, she does not do household chores because she cannot "use [her] hands long enough to finish anything" and cannot stand for too long. *Id.* at 107. Plaintiff also stated her pain affects her ability to sleep, and she must "sleep in [a] separate bed from [her] husband because [she] toss[es] and turns too much." *Id.* at 105.

At the hearing before ALJ Stacchini, Plaintiff testified she had been ill since the birth of her first child in 1999. *Id.* at 514. At that time, she stated, she suffered from a staph infection for three months and "never felt right" after that. *Id.* at 514-15. She "was always in a lot of pain" and the doctors "never knew what was wrong" with her. *Id.* at 515. She stated she "kept going to doctors," including Dr. Mahmoud Aly, and her "blood work was off the chart." *Id.* Plaintiff reported that prior to 2002, she felt pain in her hands, shoulders, knees, and toes, and she experienced swelling in her feet and ankles. *Id.* at 518. She reported as a result of these symptoms, during the relevant time period, she was unable to care adequately for her infant son and thus received significant help from her mother and husband. *Id.* at 516-17, 528-29. She stated her pain was slightly better in 2002 than at the time of the hearing in 2012. *Id.* at 519. Plaintiff also advised she had asthma in 2002 that was controlled by a nebulizer. *Id.* at 524. She also testified that she has not stopped smoking. *Id.* at 524-25. Plaintiff complained of depression prior to 2002, but she did not see a physician for depression prior to that time. *Id.* at 541. Plaintiff testified she regularly spends her days sitting in front of her house, watching her children play, reading, and watching television. *Id.* at 525-27.

3

Yaakov Taitz, Ph.D., testified as a vocational expert at the hearing. *Id.* at 542-55. Dr. Taitz classified Plaintiff's past work as an auto warranty claims clerk and an order clerk as sedentary work and her work as a shipping order clerk as light work. *Id.* at 515.

### III. Relevant Medical Evidence

#### A. Medical Evidence Before September 30, 2002 (Date Last Insured)

Records from St. Vincent's Catholic Medical Center ("SVCMC") indicate Plaintiff received prenatal and obstetrical care from September 2001 through May 2002. *Id.* at 137-257. A September 2001 entry indicated Plaintiff had asthma and stopped smoking. *Id.* at 201. On October 2, 2001, Plaintiff complained of nausea and indicated she had a cold. *Id.* at 203. Testing recorded ten days later revealed positive results for "Group B Streptococci" and "Rh Factor." *Id.* at 217. On March 15, 2002, physicians evaluated Plaintiff in the emergency room for complaints of intermittent, brief episodes of heart palpitations and dizziness. *Id.* at 222-23. The physical examination revealed a regular heart rhythm. *Id.* Plaintiff left the hospital contrary to the advice of hospital physicians. *Id.* at 224.

From May 27, 2002 through May 30, 2002, Plaintiff was hospitalized for delivery of a child. *Id.* at 139-200. These records indicate Plaintiff had a previous history of delivery by cesarean section. *Id.* at 189. On May 27, 2002, Plaintiff delivered a child by cesarean section. *Id.* at 187-88. The surgeon noted Plaintiff "tolerated the procedure well," and she was taken to the recovery room in a stable condition. *Id.* at 188. On June 8, 2002, Plaintiff complained of palpitations. *Id.* at 209. Physicians at SVCMC diagnosed asthma and identified positive "Strep" findings. *Id.* at 208-09.

#### B. Medical Evidence After September 30, 2002 (Date Last Insured)

4

Records from Dr. Mahmoud Aly indicate he treated Plaintiff from March 2004 to November 2004. *Id.* at 482-96. Dr. Aly's handwritten notes reveal on March 21, 2004 and September 1, 2004, Plaintiff complained of night sweats and tiredness and was seen with lymphocytosis. *Id.* at 482, 485. On September 2, 2004, Dr. Aly indicated Plaintiff continued to suffer from lymphocytosis and was asymptomatic and there was a question of rheumatoid arthritis. *Id.* at 486-87. He notated laboratory tests that showed a positive rheumatoid factor. *Id.* at 487. On June 12, 2004, a CT-scan of Plaintiff's abdomen and pelvis revealed: clear lungs, normal heart size; normal liver, spleen, adrenals, and kidneys; no abnormality of the uterus or bowel; duplicated right collecting system that was an anatomic variant; no hydronephrosis or hydroureter; and no evidence of enhancing renal mass. *Id.* at 488-89.

Records from Dr. Robert Fulop, hematologist, indicate he treated Plaintiff sporadically from March 2004 through March 2011. *Id.* at 257-92. Dr. Fulop's handwritten notes indicate Plaintiff's chronic problems included elevated cholesterol, rheumatoid arthritis, and asthma. *Id.* at 258. In March 2004, Plaintiff complained of occasional numbness of her right hand, frequent urination, shortness of breath, chronic cough, chronic headaches, recurrent nose bleeds, and chronic back pain. *Id.* at 258-60. Dr. Fulop listed Plaintiff's chronic problems as elevated cholesterol, rheumatoid arthritis, and asthma. *Id.* Dr. Fulop also found Plaintiff's lungs were clear, diagnosed rhinitis, and recommended the use of a wrist splint. *Id.* at 260. On February 23, 2005, Plaintiff complained of a dry cough and chills. *Id.* at 261. Dr. Fulop reported Plaintiff's lungs were clear and diagnosed sinusitis. *Id.* On November 15, 2005, Dr. Fulop treated Plaintiff for acute bronchitis. *Id.* at 263. On April 24, 2006, Plaintiff complained of a cough and nasal congestion. *Id.* at 264. Dr. Fulop noted Plaintiff had rheumatoid arthritis, noted her lungs were clear, and diagnosed her with an upper respiratory infection. *Id.* On December 6, 2006, an

echocardiogram revealed normal left ventricular systeolic function with trace-mild mitral regurgitation. *Id.* at 269. In April 2007, Plaintiff displayed tender cervical nodes. *Id.* at 266. On March 1, 2011, Dr. Fulop found tenderness of Plaintiff's neck lymph nodes, but her lungs were clear, her heart and abdomen were normal, the neurological examination was normal, and the impression included sinusitis. *Id.* at 268.

On March 14, 2008, Dr. Ludmila Feldman performed a neurological examination to evaluate Plaintiff's complaints of hand numbness and neck pain radiating in both shoulders. *Id.* at 296-99. According to these records, Plaintiff reported she suffered from these symptoms for six months, and they became worse. *Id.* at 296. A description of Plaintiff's past medical history included rheumatoid arthritis and high cholesterol. *Id.* A description of Plaintiff's social history indicated Plaintiff smoked half of a pack of cigarettes per day. *Id.* Dr. Feldman recorded the examination revealed pain and tenderness during palpation of the cervical paraspinal muscles. *Id.* at 298. Plaintiff was alert and fully oriented, and her speech was normal. *Id.* Her cranial nerves were intact, muscle strength was full in all extremities, and there was no pronator drift. *Id.* The sensory examination was intact to painful and tactile stimuli and proprioception and vibration were intact in all extremities. *Id.* Muscle stretch reflexes were 2/4 in all extremities and toes were downgoing. *Id.* There was no ataxia. *Id.* Finger-to-nose and heel-to-shin tests were within normal limits, and Plaintiff's gait was normal. *Id.* Dr. Feldman opined Plaintiff likely had carpal tunnel syndrome and might also have cervical radiculopathy but stated she would need to conduct further testing. *Id.* at 299.

On May, 12, 2009, x-rays of Plaintiff's cervical spine showed no acute abnormality. *Id.* at 300. X-rays of both of Plaintiff's shoulders were normal, although there was subtle lower cervical disc change and straightening of the normal curvature. *Id.*

In a report dated June 21, 2011, Dr. Peggy Ann Garjian, rheumatologist, reported she began treating Plaintiff on January 10, 2005. *Id.* at 315. Dr. Garjian has diagnosed Plaintiff with rheumatoid arthritis and fibromyalgia, noting her symptoms included diffuse joint pain, swelling, chronic fatigue, and muscle pain. *Id.* Clinical findings included tender joints and painful hands. *Id.* at 317. Dr. Garjian assessed Plaintiff could lift and carry ten pounds frequently, stand or walk for less than two hours per day, and sit for less than six hours per day. *Id.* at 318. Dr. Garjian assessed Plaintiff's ability to push and pull as limited and also noted environmental limitations. *Id.* at 319. Dr. Garjian also reported Plaintiff exhibited anxiety and depression secondary to illness. *Id.* at 316. She reported Plaintiff's symptoms began in 2001. *Id.*

In an arthritis medical source statement dated June 7, 2012, Dr. Garjian diagnosed rheumatoid arthritis. *Id.* at 467. She reported Plaintiff exhibited symptoms of joint pain, swelling, stiffness, fatigue, and lack of energy. *Id.* She also checked off the following objective signs: reduced range of motion (without specifying the joints affected); joint warmth, myofascial trigger points; fibromyalgia tender points; sensory changes; impaired sleep; weight change; impaired appetite; tenderness; crepitus; reduced grip strength; swelling; muscle spasm; and abnormal gait. *Id.* Dr. Garjian assessed Plaintiff could sit for less than one hour and stand for less than one hour per day and needed to shift positions and walk around. *Id.* at 468. Dr. Garjian also assessed Plaintiff: could rarely lift less than ten pounds, twist, or climb stairs; could never stoop, crouch, or climb ladders; could never lift ten pounds or more; and had limitations with reaching, handling, and fingering. *Id.* at 469. Dr. Garjian also stated Plaintiff had depression and anxiety. *Id.* at 468.

In a mental impairment questionnaire dated June 7, 2012, Dr. Garjian stated Plaintiff was depressed due to her non-psychiatric physical illness. *Id.* at 471-72. Plaintiff's signs and

7

symptoms consisted of appetite disturbance with weight change, decreased energy, change in personality, sleep disturbance, and involvement in activities that have a high probability of painful consequences which are not recognized. *Id.* at 472. Dr. Garjian opined Plaintiff had moderate restrictions of activities of daily living because of pain but did not assess any restrictions of Plaintiff's mental abilities and aptitudes. *Id.* at 473-75.

In a June 7, 2012 note, Dr. Garjian characterized Plaintiff's rheumatoid arthritis as an autoimmune disease with an environmental trigger. *Id.* at 477. She reported Plaintiff was ill before she saw Plaintiff in January 2005 and that Plaintiff's symptoms dated back to early 2002. *Id.* In a letter dated March 15, 2013 Dr. Garjian stated Plaintiff's rheumatoid arthritis symptoms began after the birth of her son in February 1999, when Plaintiff had a staph infection that precipitated rheumatoid arthritis. *Id.* at 498. She further opined Plaintiff was permanently disabled as of that time. *Id.*

In a psychiatric review technique form dated June 27, 2011, Dr. S. Hou, a state agency psychiatric consultant, opined there was insufficient evidence of a mental impairment. *Id.* at 324.

## STANDARD OF REVIEW

When a claimant challenges a denial of disability benefits by the Social Security Administration ("SSA"), the Court's function is not to evaluate *de novo* whether the claimant has a disability but rather to determine "whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also* 42 U.S.C. § 405(g); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (applying "substantial evidence" standard of review). Substantial evidence is "more than a mere scintilla"—it is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks and citations omitted). In determining whether the record contains substantial evidence to support a denial of benefits, the reviewing court must examine the entire record, weighing the evidence on both sides to ensure the claim "has been fairly evaluated." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983)).

It is the function of the SSA—not the federal district court—to "weigh the conflicting evidence in the record" and resolve such conflicts. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence."). "While the ALJ need not resolve every conflict in the record, 'the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence.'" *Calzada v. Asture*, 753 F. Supp. 2d 250, 268-69 (S.D.N.Y. 2010) (Sullivan, J.) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)). To fulfill this burden, the ALJ must "'adequately explain his reasoning in making the findings on which his ultimate decision rests'" and must "'address all pertinent evidence.'" *Kane v. Astrue*, 942 F. Supp. 2d 301, 305 (E.D.N.Y. 2013) (Kuntz, J.) (quoting *Calzada*, 753 F. Supp. 2d at 269).

Ultimately, the issue before the Court is not whether Plaintiff, in argument on appeal, can articulate an interpretation of the evidence in her favor, but whether a reasonable factfinder could have weighed the evidence as did the ALJ. *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "If the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *Id.* But if the ALJ applied an improper legal

9

standard, or if there are gaps in the administrative record, then remand is warranted. *See Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

## DISCUSSION

### I. Determination of Disability

#### A. Applicable Law

"To be eligible for disability insurance benefits, an applicant must be 'insured for disability insurance benefits.'" *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)). An applicant must also "satisfy certain earnings requirements. Generally, an applicant must apply for benefits during the period in which she satisfies these earning requirements. If the applicant does not apply for benefits during this period, she may still obtain benefits if she has been under a continuous period of disability that began when she was eligible to receive benefits. *Hartfiel v. Apfel*, 192 F. Supp. 2d 41, 42 n.1 (W.D.N.Y. 2001) (Larimer, J.).[2] To be eligible for SSI benefits, an individual must be "aged, blind, or disabled" as defined in 42 U.S.C. § 1382c and, *inter alia*, meet the resource and income limits specified in the Act.

For purposes of both SSDI and SSI benefits, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment in question must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work

---

[2] The ALJ determined Plaintiff meets the insured status requirements of the Act through September 30, 2002. Tr. at 18.

10

experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a disability claim, the Commissioner must apply the five-step sequential process set forth in 20 C.F.R. §§ 404.1520, 416.920. *See, e.g., Rosa*, 168 F.3d at 77-78 (laying out the five-step process for evaluating disability claims). At the first step, the Commissioner must determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If not, the second step requires the Commissioner to determine whether the claimant has a "severe medically determinable physical or mental impairment." *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has such an impairment, the Commissioner progresses to the third step and must determine whether the impairment or combination of impairments meets or equals one of the listings in Appendix 1 of the regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairment does not match any of the listings, the fourth step requires the Commissioner to determine whether the claimant's residual functional capacity ("RFC") allows the claimant to perform past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the final step requires the Commissioner to determine whether the claimant can perform any job based on his or her RFC and vocational considerations—work experience, age, and education. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant bears the burden of proving the first four steps, at which point the burden shifts to the Commissioner at the fifth step. *Rosa*, 168 F.3d at 77-78.

### B. The ALJ's Decision

On June 14, 2014, ALJ Stacchini issued a decision following the five-step procedure to evaluate Plaintiff's claim. Tr. at 13-20. At the first step, ALJ Stacchini determined Plaintiff did

not engage in substantial gainful activity since the alleged onset date of February 1, 1999 through her last insured date of September 30, 2002. *Id.* at 18. At the second step, he found there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment prior to the expiration of Plaintiff's last-insured date. *Id.* at 18-20. In reaching his decision, the ALJ gave "little weight" to the opinion of Dr. Garjian—who began treating claimant on January 10, 2005—because she did not begin treating Plaintiff until 2005, and her claims Plaintiff's symptoms began in February 1999 were medically unsubstantiated. *Id.* at 19. The ALJ also found Plaintiff could not use treatment records and laboratory reports from Plaintiff's physician, Dr. Aly, "to establish disability prior to that time" because Dr. Aly provided records and reports from only as early as 2004. *Id.* Therefore, the ALJ determined at step two Plaintiff was "not under a disability" as defined in the Social Security Act at any time from February 1, 1999, the alleged onset date, through September 30, 2002, the date Plaintiff was last insured. *Id.* at 20.

## II. The ALJ's Review of the Treating Physician's Opinion

Plaintiff argues the ALJ failed to evaluate properly the medical opinions of record because the ALJ's reasons for according "little weight" to Dr. Garjian's opinion were insufficient. Pl. Mem. at 16-22. Defendant argues the ALJ properly assigned weight to the medical opinions in the record because Dr. Garjian began treating Plaintiff two years after Plaintiff's last-insured date, Dr. Garjian's records were largely benign, and Dr. Garjian's opinion constituted an ultimate finding of disability, which is reserved to the Commissioner under SSR 96-5p. *See* Def. Mem. at 14-16.

SSA regulations mandate procedures to which an ALJ must adhere in determining the appropriate weight to assign a treating physician's opinion. Under those regulations, first, the

ALJ must determine whether the treating physician's opinion regarding a claimant's impairment is entitled to "controlling weight." *See* 20 C.F.R. § 404.1527(c)(2). Generally, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(c)(2)).

"Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it." *Estrella v. Berryhill*, 17-3247, 2019 WL 2273574, at *2 (2d Cir. 2019). In making this determination, the ALJ must "explicitly consider" the following factors enumerated by the Second Circuit in *Burgess v. Astrue*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist. *Estrella*, 2019 WL 2273574, at *2; *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129).

At both of the above steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Estrella*, 2019 WL 2273574, at *2 (alterations in original) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)). But an ALJ's failure to apply "explicitly" the *Burgess* factors when assigning weight at the second step of this analysis is procedural error. *Id.* at *3 (citing *Selian*, 708 F.3d at 419-20). Should the ALJ commit such procedural error, the district court must consider whether the ALJ has otherwise provided good reasons for its weight assignment. *Id.*; *Halloran*, 362 F.3d at 33. If "a searching review of the record" assures the reviewing court "the substance of the treating physician rule was not traversed," the court will affirm. *Halloran*, 362

13

F.3d at 32. On the other hand, remand is appropriate "when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion." *Id.* at 33.

In the instant action, the ALJ did not cite "good reasons" for assigning less-than-controlling weight to the opinion of Plaintiff's treating physician, Dr. Garjian, particularly because the ALJ's reasons are not supported by substantial evidence. First, in assigning less-than-controlling weight to Dr. Garjian's opinion, the ALJ described inconsistencies in Dr. Garjian's own submissions to the SSA: Whereas Dr. Garjian initially opined Plaintiff's impairments likely began as early as 2001, she later claimed Plaintiff's symptoms began in February 1999 and that the claimant remains permanently disabled. Tr. at 19. But even when there are inconsistencies in a treating physician's opinions, "circumstantial critique[s] by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion." *Wagner v. Sec. of Health & Human Servs.*, 906 F.2d 856, 862 (2d Cir. 1990). The inconsistent onset dates Dr. Garjian provided in this case and on these facts do not rise to the level of "overwhelmingly compelling."

Second, the ALJ noted he assigned less-than-controlling weight to Dr. Garjian's opinion under SSR 96-5p because ultimate findings of disability are reserved to the Commissioner. Tr. at 19. Although this is a correct statement of law,[3] Dr. Garjian did not opine only as to Plaintiff's disability status. Rather, in her letter, Dr. Garjian referenced the onset of Plaintiff's rheumatoid arthritis and further opined Plaintiff's symptoms began shortly after the birth of her first son in February 1999, when she incurred a staph infection. *Id.* at 355.

---

[3] Per SSR 96-5p, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." Consequently, although an ALJ should not disregard a treating source's statement that a claimant is disabled, such a statement is not entitled to controlling weight or special significance. *See Arruda v. Comm'r of Soc. Sec.*, 363 F. App'x 93, 95-96 (2d Cir. 2010) (summary order) (citing SSR 96-5p). Notably, the SSA rescinded SSR 96-5p in March 2017, though it was in effect at the time of the ALJ's decision. *Rescission of SSRs 96–2p, 96–5p*, and 06–03p, 82 Fed. Reg. 57, 15,263 (March 27, 2017).

Third, the ALJ assigned less-than-controlling weight to Dr. Garjian's opinion because it was retrospective, noting:

> [T]hese diagnoses and opinion statements were made well after the expiration of the claimant's DLI, were not substantiated by any additional medical evidence, and are thus inapplicable to the time period considered. . . . [T]he undersigned assigns little weight to this opinion, as there is no objective medical evidence submitted in support of this conclusion.

*Id.* at 19. Although contemporaneous medical evidence is preferable and more convincing, a retrospective diagnosis also is entitled to weight, particularly where that evidence is largely unrebutted and uncontradicted. *Moses v. Sullivan*, 91-cv-6980 (MBM), 1993 WL 26766, at *4 (S.D.N.Y. 1993) (Mukasey, J.). Indeed, a treating physician's retrospective diagnosis "is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (quoting *Rivera v. Sullivan*, 923 F.2d 964, 968 (2d Cir. 1991)); *see also Maloney v. Berryhill*, 16-cv-3899 (ADS), 2018 WL 400772, at *5 (E.D.N.Y. Jan. 12, 2018) (Spatt, J.). As outlined in further detail below, in his discussion as to the weight he assigned Dr. Garjian's opinion, the ALJ did not cite medical evidence contradicting Dr. Garjian's opinion. He merely emphasized Dr. Garjian's opinion was retrospective and there were insufficient contemporaneous records to corroborate Dr. Garjian's opinion.

Finally, consistent with the above, the ALJ assigned less-than-controlling weight to Dr. Garjian's opinion because he found her opinion statements "were not substantiated by any additional medical evidence." Tr. at 19. But the record contains evidence supporting Dr. Garjian's opinion. Indeed, as Plaintiff points out, the ALJ ignored medical evidence that included laboratory reports dating prior to her last-insured date, which are significant for showing positive "Group B Streptococci" and Rh Factor in 2001 and positive Streptococcus

15

findings in May 2002. *Id.* at 210, 217, 227. The record also includes laboratory reports documenting positive Rh Factor and post sedimentation rate, some of which are before Plaintiff's last-insured date. *Id.* at 217, 258, 296, 486, 490, 492, and 495. The record is rife with references to Plaintiff's rheumatoid arthritis. And these lab results, to some extent, corroborate Plaintiff's lay testimony that her blood work was "off the charts" prior to her last-insured date.

Furthermore, the only evidence the ALJ cites remotely contradictory to Dr. Garjian's opinion are treatment notes indicating Plaintiff tolerated her 2002 Cesarean section well and without pain. *Id.* at 19. But the ALJ cites this evidence elsewhere in his decision—not in his discussion as to the weight he assigned Dr. Garjian's opinion. Defendant argues Dr. Feldman's March 2008 neurological report—which Dr. Garjian submitted and indicated that "plaintiff walked with a normal gait and [] had full muscle strength in all extremities"—contradict Dr. Garjian's medical opinion. Def. Mem. at 16. But Dr. Feldman also found Plaintiff displayed abnormal muscle stretch reflexes of 2/4 in all extremities and "down going toes," and she concluded Plaintiff's "physical and neurological exam is significant for pain and tenderness during palpation of the cervical paraspinal muscles." Tr. at 297-99. As the record stands, Dr. Garjian's opinion was supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with other substantial evidence in the record.[4]

Even if the ALJ had provided good reasons to conclude Dr. Garjian's opinion was entitled to less-than-controlling weight, the ALJ did not adhere to proper procedure in concluding Dr. Garjian's opinion was entitled to "little weight." The ALJ "explicitly considered" only two of the four *Burgess* factors. With respect to the first factor—the frequency,

---

[4] Notably, the Second Circuit has recognized "'[a] patient's report of complaints, or history, is an essential diagnostic tool'" that qualifies as a medically acceptable clinical and laboratory diagnostic technique. *Burgess*, 537 F.3d at 128 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)).

length, nature, and extent of treatment—the ALJ noted only that Dr. Garjian had treated the claimant since January 10, 2005, after Plaintiff's last-insured date. Tr. at 19. He detailed neither the nature of Plaintiff's interactions with Dr. Garjian nor the extent and frequency of Dr. Garjian's treatment of Plaintiff. *Id.* With respect to the second factor—the amount of medical evidence supporting the opinion—the ALJ stressed Dr. Garjian's diagnoses and opinion statements were made well after the expiration of Plaintiff's last-insured date and were not substantiated by any additional medical evidence in the record. *Id.* With respect to the third factor—the consistency of the opinion with the remaining evidence—the ALJ detailed the records that fail to show the existence of a medically determinable impairment prior to the expiration of Plaintiffs last-insured date. *Id.* Finally, with respect to the fourth factor—whether the physician is a specialist—the ALJ did not consider Dr. Garjian's specialization in rheumatology. *Id.* The ALJ therefore committed procedural error.

When the ALJ "procedurally err[s], the question becomes whether . . . the record otherwise provides good reasons for assigning little weight to [the treating source's] opinion." *Estrella*, 2019 WL 2273574, at *2 (internal quotation marks and alterations omitted). As noted above, as it stands, the record does not otherwise provide good reasons for assigning "little weight" to the treating source's opinion. The ALJ's reasons for assigning "little weight" to Dr. Garjian's opinion were largely the same as his reasons for assigning less-than-controlling weight to Dr. Garjian's opinion in the first instance. *See id.* at *2-3.

In light of the ALJ's failure to provide "good reasons" supported by substantial evidence for declining to assign controlling weight to the treating physician's medical opinion, the Court concludes the ALJ traversed the substance of the treating physician rule. Accordingly, the Court

17

remands to the ALJ for reconsideration of Plaintiff's claim for disability benefits consistent with the procedural mandates of the Act.

On remand, the ALJ should reconsider whether the treating physician's opinion is entitled to controlling or less-than-controlling weight, with specific reference to the dictates of 20 C.F.R. § 404.1527(c)(2)—*i.e.*, whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. If the ALJ again determines the treating physician's opinion is not entitled to controlling weight, the ALJ should cite specifically to relevant medical and non-medical evidence in this case that contradicts the treating physician's opinion. Should the ALJ afford less-than-controlling weight to the treating physician's opinion, the ALJ should also apply all four *Burgess* factors in determining the appropriate weight to accord the opinion.[5]

---

[5] Plaintiff also argues remand is warranted because the ALJ committed reversible errors of law in: (1) requiring contemporaneous medical evidence to establish disability prior to her last-insured date and failing to consider lay evidence of onset; and (2) contravening the requirements of SSR 83-20. The Court declines to consider these arguments, having already found the ALJ's decision reversible for contravening the treating physician rule. The court notes, however, that where an ALJ explicitly concludes at step two of the five-step framework that Plaintiff was not under a disability, he need not establish an onset date in accordance with the dictates of SSR 83-20. *See Baladi v. Barnhart,* 33 F. App'x 562, 564 (2d Cir. 2002) (summary order) ("SSR 83–20 is inapplicable to the decision under review, because the ALJ's determination that plaintiff was not disabled obviated the duty under SSR 83-20 to determine an onset date.").

18

## CONCLUSION

For the foregoing reasons, Defendant's motion for judgment on the pleadings, ECF No. 13, is DENIED. The Court hereby REMANDS this action to the Social Security Administration for further proceedings, including a new hearing and a new decision, consistent with this opinion. Upon remand, the Commissioner will reevaluate the medical opinion evidence and consider any new evidence submitted. The Clerk of Court is directed to close this case.

**SO ORDERED.**

*s/William F. Kuntz,* II

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: May 31, 2019
      Brooklyn, New York